```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
GENERAL ASSEMBLY SPACE, INC.,                                     :
                                                                  :
                           Plaintiff,                             :
                                                                  :       23-CV-3423 (JMF)
              -v-                                                 :
                                                                  :       OPINION AND ORDER
SOCIAL FINANCE CAREER IMPACT BOND                                 :
GENERAL ASSEMBLY LLC et al.,                                      :
                                                                  :
                           Defendant.                             :
                                                                  :
------------------------------------------------------------------X
```

JESSE M. FURMAN, United States District Judge:

  General Assembly Space, Inc. ("General Assembly"), an education provider, brings this lawsuit against Social Finance, Inc. ("Social Finance") and its for-profit subsidiary, Social Finance Career Impact Bond General Assembly LLC ("CIB LLC"), alleging that Defendants reneged on an agreement to purchase certain receivables resulting from tuition contracts between General Assembly and its students. Defendants now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for dismissal of General Assembly's claims. ECF No. 24. They argue that they were entitled to reject General Assembly's requests for payment under the plain language of the agreement between General Assembly and CIB LLC. The Court agrees. Accordingly, and for the reasons that follow, Defendants' motion to dismiss is GRANTED, and the Amended Complaint is dismissed in its entirety.

## BACKGROUND

  In considering a motion to dismiss pursuant to Rule 12(b)(6), a court may consider facts stated in the Complaint, any documents attached to the Complaint, and any documents incorporated by reference into the Complaint. *See, e.g.*, *Nechis v. Oxford Health Plans, Inc.*, 421

F.3d 96, 100 (2d Cir. 2005). Where, as here, the claim is for breach of contract, the Complaint is deemed to incorporate the alleged contract by reference because the alleged contract is integral to the claim. *See, e.g.*, *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005). Furthermore, the operative Complaint here — the Amended Complaint, ECF No. 23 ("Compl.") — expressly incorporates the parties' principal contract, the Forward Purchase Agreement or "FPA," ECF No. 26, Ex. A ("FPA"). *See, e.g.*, Compl. ¶¶ 14, 27, 36. Accordingly, the following facts are drawn from the Amended Complaint and from documents referenced therein, including the FPA, and are assumed to be true for purposes of this motion. *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).[1]

**A.     The Parties' Agreement**

General Assembly provides "short-form, instructor-led training programs focused on in-demand technical skills . . . such as coding, user experience (UX) design, data science and analytics, and marketing." Compl. ¶¶ 29-30. To enable "individuals with talent and motivation but who lack[] access to funds for training due to poverty, scant credit or other limitations to participate in training that would prepare them for roles within in-demand, more lucrative fields and career paths," General Assembly "offers its students the opportunity to defer payment of their tuition until after graduation." *Id.* ¶¶ 5, 33. Under this deferred tuition program, students are not charged any upfront tuition; instead, pursuant to a financing agreement between General Assembly and each student, the student is "obligat[ed] . . . to pay an amount equal to ten percent

---

[1] Also incorporated by reference into the Amended Complaint, and thus fair game here, are Purchase Notices 005 and 006 (discussed below). *See* Compl. ¶¶ 161-62; *see also* ECF No. 26, Ex. B. By contrast, the Court may not, and does not, consider the Declaration of Cristina Rodriguez that General Assembly filed in support of its opposition to Defendants' motions. *See* ECF No. 31. That said, consideration of the Rodriguez Declaration would not change the Court's conclusions here.

of their income up to a specific cap, but *only* if they successfully obtained a job earning more [than] $40,000 per year after graduation" and only for four years after graduation. *Id.* ¶ 7.

In November 2019, General Assembly and CIB LLC "entered into a series of interrelated agreements" — including, most relevant here, the FPA — pursuant to which CIB LLC would purchase certain student repayment obligations, defined in the FPA as "Receivables," from General Assembly. *Id.* ¶¶ 2, 14; *see* FPA §§ 1.01, 2.01. Significantly, CIB LLC agreed to purchase only "Eligible Receivables," defined in the FPA as Receivables meeting certain criteria, one of which was that the relevant student had "agreed to enroll full-time in an Eligible Program." FPA § 1.01. "Eligible Program" was defined, in turn, as "each of the following full-time, on-campus educational programs offered by the Seller in New York, Boston, Chicago, Washington D.C., Atlanta, Denver, Austin, Seattle, Los Angeles and San Francisco: User Experience Design Immersive and Software Engineering Immersive and any additional programs as the Seller and the Purchaser may mutually agree in writing from time to time that constitute an 'Eligible Program.'" *Id.* Section 5.01(j) of the FPA provided that General Assembly "shall maintain and offer each Eligible Program in a manner consistent with" its then-effective "policies and procedures," but that it "may update its policies and procedures to maintain compliance with Applicable Law without such changes constituting a breach of this section." *Id.* § 5.01(j).

The FPA established a process for CIB LLC's purchase of Eligible Receivables. First, General Assembly had to deliver a "duly completed Purchase Notice" setting forth certain information about the Receivables to be purchased and a proposed "Purchase Date" within ten business days of the Purchase Notice's delivery. *Id.* § 2.01(b). The FPA specified that the "Purchase Notice shall relate to Receivables originated in the calendar month immediately prior

3

to the calendar month in which such Purchase Date will occur." *Id.* "Upon the satisfaction of" certain "conditions precedent," CIB LLC was then obligated to "pay for each Purchase" on the Purchase Date. *Id.* § 2.01(c). Specifically, the FPA provided that CIB LLC's obligation to purchase Receivables was "subject to," among other things, General Assembly's "compliance with all of its obligations" under the FPA and General Assembly's fulfilment of its representation and warranty "that each Receivable to be Purchased by the Purchaser pursuant hereto is an Eligible Receivable on the applicable Purchase Date." *Id.* §§ 3.03(a), 4.02. If a Purchase Notice met these and other requirements set forth in the FPA, CIB LLC would complete its purchase and General Assembly would then deliver a Bill of Sale "identifying each of the Receivables sold." *Id.* §§ 2.01(a), 3.03.

Importantly, the FPA provided that CIB LLC's acceptance of a Receivable that did not meet the parties' contractual requirements did not constitute a waiver of those requirements for future purchases. Specifically, Section 3.04 of the FPA provided as follows: "Acceptance by the Purchaser of any Receivable included in a Purchase or the related Purchase Notice or Bill of Sale shall not constitute a waiver of any condition to such Purchase unless such waiver is in a writing signed by the non-defaulting party." *Id.* § 3.04; *see also id.* § 11.01 ("No failure or delay on the part of the Purchaser or the Seller (or any assignee thereof) in exercising any power, right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or remedy preclude any other further exercise thereof or the exercise of any other power, right or remedy."). Another section of the FPA specified that "[a]ny provision of this Agreement may be amended if, but only if, such amendment is in writing and is signed by the Seller and the Purchaser." *Id.* § 11.01.

B.   **The Parties' Dispute**

General Assembly launched the program in December 2019 — three months before the U.S. economy shut down as a result of the COVID-19 pandemic. Compl. ¶¶ 69, 72. When the pandemic started, General Assembly "was required by law to halt in-person, campus-based learning; in order to continue serving students, General Assembly pivoted its offerings to remote, online learning." *Id.* ¶ 78. When General Assembly advised Social Finance that it had "flipped all of [its] on-campus deliveries to remote," the CEO of Social Finance responded by praising General Assembly's "commitment to excellence and to students" as "palpable." *Id.* ¶¶ 79-80; *see also id.* ¶ 83. Further, in response to General Assembly's "suggest[ion]" that enrollment in the program be temporarily halted, Defendants "expressed their desire that the Program continue uninterrupted." *Id.* ¶¶ 81-82. General Assembly proceeded with enrolling students to participate in the program remotely "and then educating and graduating them." *Id.* ¶ 84. In the meantime, "Social Finance publicized the Program and its role in the Program." *Id.* In April 2020, "Defendants and General Assembly agreed that effective May 1, 2020, the Program would accept applications by remote students funded by Catalyst 2 for the SEI and UXDI programs." *Id.* ¶ 90. Throughout 2020 and 2021, "General Assembly worked in close partnership with Social Finance and CIB LLC . . . to manage the Program, with Defendants emphatically encouraging continued enrollment into the remote courses." *Id.* ¶ 85.

The Amended Complaint alleges that, "in the midst of an historic pandemic, the parties adopted procedures that did not follow the precise language of the Forward Purchase Agreement." *Id.* ¶ 100. Specifically, although the FPA "contemplated monthly purchases" of Eligible Receivables by CIB LLC, the parties "adopted a payment process whereby periodically, but not monthly, General Assembly would provide CIB LLC with a spreadsheet (rather than a

5

formal purchase notice)" of Receivables. *Id.* ¶¶ 101, 103. Defendants "would review the spreadsheet, provide comments or corrections, and the parties would reconcile any differences"; thereafter, "General Assembly would issue the formal Purchase Notice for payment." *Id.* ¶¶ 104-05. According to General Assembly, this process resulted in CIB LLC paying for the Receivables in four Purchase Notices — Purchase Notices 001 through 004 — even though "the course of performance did not technically comply with the processes set out in the language of the Forward Purchase Agreement." *Id.* ¶¶ 106-17, 120. General Assembly alleges that it "relied in good faith on the Parties' course of performance and reasonably believed and expected that CIB LLC would continue to honor Purchase Notices that substantially conformed with the Parties' well-established custom, practice and course of performance." *Id.* ¶ 121.

In late 2021, however, things took a turn. *Id.* ¶¶ 143-65. Eventually, General Assembly finalized and sent Purchase Notice 005, in the amount of $3,229,974.46, and Purchase Notice 006, in the amount of $663,427.50, for Receivables originated on and after December 1, 2021. *Id.* ¶ 161. These Purchase Notices "were substantially identical to and conformed to the same custom, practice and/or course of performanc [sic] as the Parties had used in connection with Purchase Notice Numbers 001 through 004 over the first two years of the Program." *Id.* ¶ 162. Nevertheless, "[f]or the first time, CIB LLC refused to honor (and continues to refuse to honor) Purchase Notice Numbers 005 and 006, alleging in part that none of the [Receivables] were eligible for purchase." *Id.* ¶ 163. "For example, CIB LLC claimed that the [Receivables] were ineligible for purchase because the participants had attended classes remotely rather than on the ten General Assembly campuses referenced in the Forward Purchase Agreement . . . ." *Id.* ¶ 165.

This lawsuit followed.

## LEGAL STANDARDS

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all facts set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008). A claim will survive a Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

## DISCUSSION

General Assembly pleads five claims: (1) "Action for the Price," pursuant to Section 2-709 of the New York Uniform Commercial Code ("U.C.C."); (2) specific performance; (3) incidental damages; (4) breach of the implied covenant of good faith and fair dealing; and (5) promissory estoppel. *Id*. ¶¶ 166-95. All five are brought against CIB LLC; only one — the promissory estoppel claim — is brought against Social Finance. *Id*. at 30-31. Defendants move to dismiss all of General Assembly's claims.

In theory, Defendants' motion could be swiftly granted as to General Assembly's first three claims. To begin, the FPA is a contract for the sale of receivables, not "goods," and thus Article 2 of the U.C.C. does not apply. *See, e.g.*, *Takisada Co. v. Ambassador Factors Corp.*,

7

556 N.Y.S.2d 788, 790 (Sup. Ct. 1989) (holding that the "sale and assignment of accounts receivable is not the sale of goods" and thus not governed by Article 2 of the U.C.C.).[2]  Second, "specific performance" and "incidental damages" are remedies for a breach of contract, not standalone causes of action.  *See Rhodes v. Davis*, 628 F. App'x 787, 791 (2d Cir. 2015) (summary order) (specific performance); *CLC/CLI Liquidating Tr. v. Bloomingdale's, Inc.*, No. 603859/03, 2005 WL 3487817, at *2 (N.Y. Sup. Ct. Dec. 14, 2005) (incidental damages); *see also, e.g.*, *Weil v. Murray*, 161 F. Supp. 2d 250, 257 (S.D.N.Y. 2001) (assessing whether incidental damages and specific performance were appropriate only after establishing that the defendant was liable for breach of contract).

At their core, however, General Assembly's first three claims could be understood as a single claim for common law breach of contract, *see also, e.g.*, Pl.'s Opp'n 20 n.4, 23 (making reference to breach of contract as an underlying claim), and the Court will treat them as such — in no small part because the question of whether General Assembly should be given leave to amend turns on the viability of such a claim.  The Court will address that claim and then turn to General Assembly's implied-covenant and promissory estoppel claims.

**A. Breach of Contract**

To establish a claim for breach of contract under New York law, which applies here, "a plaintiff must show (1) the existence of an agreement, (2) adequate performance of the contract by the claimant, (3) breach of contract by the accused, and (4) damages."  *Stadt v. Fox News*

---

[2]  General Assembly argues that the FPA contemplates application of U.C.C. Article 2, *see* ECF No. 30 ("Pl.'s Opp'n"), at 11, but that argument is unavailing because the contract does not refer to Article 2.  "In determining whether a contract is for the sale of goods, and thus covered by the UCC, it is necessary to look to the 'essence' or main objective of the parties' agreement." *Exp. Dev. Canada v. Elec. Apparatus & Power, L.L.C.*, No. 03-CV-2063 (HBP), 2008 WL 4900557, at *11 (S.D.N.Y. Nov. 14, 2008).  The "essence" of the FPA was plainly the sale of receivables, not goods.  *See, e.g.*, FPA § 2.01 ("Purchases of *Receivables*" (emphasis added)).

*Network LLC*, 719 F. Supp. 2d 312, 318 (S.D.N.Y. 2010) (cleaned up). A written contract must be interpreted according to the parties' intent, which is "derived from the plain meaning of the language employed in the agreements." *In re Lehman Bros. Inc.*, 478 B.R. 570, 585-86 (S.D.N.Y. 2012) (internal quotation marks omitted). In a dispute over the meaning of a contract, the "threshold question . . . is whether the contract terms are ambiguous," *see, e.g.*, *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000), which is a question of law for the Court to decide, *see, e.g.*, *Broder*, 418 F.3d at 197; *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004). A contract is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). In such circumstances, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss. *See, e.g.*, *Advanced Mktg. Grp., Inc. v. Bus. Payment Sys., LLC*, 300 F. App'x 48, 49 (2d Cir. 2008).

Applying these standards here, the Court concludes that General Assembly's contract claim fails as a matter of law. As noted, the FPA unambiguously provided that CIB LLC's obligation to purchase Receivables was subject to certain conditions precedent being met. *See* FPA §§ 2.01(c), 3.03(a). Yet the record is clear that these conditions were not met as to the Receivables listed in Purchase Notices 005 and 006 in several respects. For starters, the Receivables were not "Eligible Receivables." The FPA defined that term to include only students who had "agreed to enroll full-time in an Eligible Program," and "Eligible Program" was defined, in turn, to include only certain "full-time, *on-campus* educational programs" offered by General Assembly in ten specified cities. *Id.* § 1.01 (emphasis added). Yet because General

Assembly had "flipped all of [its]" programs to be "remote" due to the COVID-19 pandemic, all or nearly all of the Receivables listed in Purchase Notices 005 and 006 were for students who were enrolled in remote programs. *See* Compl. ¶¶ 79, 84; Pl.'s Opp'n 8-9; *see also* ECF No. 26, Ex. B.  In addition, to trigger CIB LLC's payment obligation, each Purchase Notice had to conform to the requirements set forth in the FPA. *See* FPA § 2.01(b).  Among other things, the FPA unambiguously provided that any "Purchase Note shall relate to Receivables originated in the calendar month immediately prior to the calendar month in which such Purchase Date will occur." *Id.*  Yet, as Plaintiff concedes, all or nearly all of the Receivables listed in Purchase Notices 005 and 006 had been originated outside of that window. *See* Compl. ¶¶ 161; Pl.'s Opp'n 17 n.3; *see also* ECF No. 26, Ex. B.

    The Amended Complaint does not allege otherwise.  In fact, it explicitly *concedes* that Purchase Notices 005 and 006 "did not technically comply with the processes set out in the language of the Forward Purchase Agreement."  Compl. ¶¶ 120, 122, 124, 162.  Instead, General Assembly's argument for breach is that the FPA was effectively amended through "the Parties' custom, practice and course of performance" — namely, through the statements Defendants made encouraging General Assembly's conversion to remote programming and through the fact that CIB LLC paid for the Receivables listed in Purchase Notices 001 through 004 despite their non-compliant nature. *Id.* ¶¶ 120, 162.  But the plain language of the FPA is fatal to that argument.  Section 11.01 provided that the FPA could be amended "*only* if[] such amendment [was] in writing and [was] signed" by the parties to the contract.  FPA § 11.01 (emphasis added).  And Section 3.04 provided that "[a]cceptance" by CIB LLC "of any Receivable included in a Purchase or the related Purchase Notice or Bill of Sale *shall not constitute a waiver* of any condition to such Purchase unless such waiver is in a writing signed by the non-defaulting

10

party." *Id.* § 3.04 (emphasis added).  Per the plain terms of these provisions, CIB LLC was entitled to reject Purchase Notices 005 and 006 as non-compliant even though General Assembly had been led to believe, by Defendants' statements and prior practices, that it would pay.

Perhaps recognizing the weakness of its claim as pleaded, General Assembly takes a different tack in its memorandum of law opposing Defendants' motion, arguing that "applicable language found elsewhere in the FPA permitted the conduct." Pl.'s Opp'n 17-18.  Putting aside the fact that a party may not amend its pleading through a memorandum of law, *see, e.g.*, *Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 80 (2d Cir. 2022), these arguments are wholly without merit.  General Assembly's first argument relies on the fact that "Eligible Program" is defined to include "*any additional programs* as the Seller and the Purchaser *may mutually agree in writing* from time to time that constitute an 'Eligible Program,'" FPA § 1.01 (emphasis added).  The parties, General Assembly contends, mutually agreed in writing when the pandemic began that the term "Eligible Program" would include "remote instruction." Pl.'s Opp'n 17 (citing Compl. ¶ 90); *see id.* at 20 (citing Compl. ¶¶ 79-92); *id.* at 22-23 (citing Compl. ¶¶ 79-105).  But this contention falls flat for multiple reasons.

First, "additional" involves "the act or process of *adding*."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 24 (2002) (emphasis added).  The programs at issue, however, were not added to those listed in the FPA; they were the very same programs, merely "flipped" to be remote.  Compl. ¶ 79.  Second, the Amended Complaint does not actually point to any writing, let alone a "mutual[] agree[ment] in writing." *See* FPA § 1.01.  In some instances, it alleges that the parties "agreed" without specifying whether such agreement was in writing. *See, e.g.*, Compl. ¶¶ 81-82, 90.  In others, it quotes encouraging statements made by representatives of Social Finance. *See, e.g.*, *id.* ¶¶ 80, 83, 126.  But again, it fails to allege that these statements

were made in writing.  Nor can any of these statements be read to confirm mutual agreement that remote programs would constitute Eligible Programs within the meaning of the FPA.  Third, all of the statements cited in the Amended Complaint are attributed to representatives of *Social Finance*.  Social Finance, however, was not a signatory to the FPA.  Instead, *CIB LLC's* agreement was required to add Eligible Programs.  Finally, and in any event, at best, General Assembly's argument addresses only one defect in the Purchase Notices at issue: the fact that the Receivables were not in connection with Eligible Programs.  It does nothing to address the other defects, such as untimeliness, which independently permitted CIB LLC to reject them.

General Assembly's other argument rests on Section 5.01(j) of the FPA, which required that it "maintain and offer each Eligible Program in a manner consistent with" its then-effective "policies and procedures," but provided that it "*may update its policies and procedures to maintain compliance with Applicable Law without such changes constituting a breach of this section*."  FPA § 5.01(j) (emphasis added).  This provision, General Assembly contends, "permit[ted] a course of performance between the parties such that General Assembly, as seller, was within its rights to deviate from the strict language of the FPA to accommodate the changing landscape occasioned by the pandemic and the government-mandated transition to remote classes."  Pl.'s Opp'n 16.  But this argument also has multiple defects.  First, General Assembly does not and cannot identify any law mandating that it provide remote programs.  It may be, as the Amended Complaint alleges, that "General Assembly was required by law to halt in-person, campus-based learning."  Compl. ¶ 78.  But it was not required by law to "pivot[] its offerings to remote, online learning."  *Id.*  General Assembly made its own voluntary, albeit admirable, decision to do that "to continue serving students."  *Id.*  Second, and in any event, the language upon which General Assembly relies is limited to conduct that would otherwise breach *Section*

12

*5.01*; it does not excuse breaches of General Assembly's other contractual obligations, such as those set forth in Section 2.01(a) and Section 3.03(a).  And finally, this argument also fails to address the other grounds on which CIB LLC was entitled to reject payment in connection with Purchase Notices 005 and 006.  For example, General Assembly does not and cannot point to any "Applicable Law" that required it to include otherwise untimely Receivables in the Purchase Notices.

In short, the unambiguous language of the FPA makes plain that CIB LLC was on firm ground rejecting General Assembly's requests for payment in Purchase Notices 005 and 006.  Accordingly, any contract claim must be and is (or would be) dismissed.

### B. Implied Covenant of Good Faith and Fair Dealing

General Assembly's next claim — for breach of the implied covenant of good faith and fair dealing — requires less discussion.  The implied covenant requires that "neither party to a contract shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract, or to violate the party's presumed intentions or reasonable expectations."  *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) (cleaned up); *see also Cordero v. Transamerica Annuity Serv. Corp.*, 190 N.Y.S.3d 274, 281-82 (2023).  Thus, "conduct that while technically not constituting a breach of contract, nevertheless deprives the plaintiff of the benefit of its bargain" can constitute a breach of the implied covenant.  *VR Optics, LLC v. Peloton Interactive, Inc.*, No. 16-CV-6392 (JPO), 2017 WL 3600427, at *4 (S.D.N.Y. Aug. 18, 2017).  But an implied-covenant claim "cannot 'be used to add contract terms not bargained for.'"  *Alta Partners, LLC v. Getty Images Holdings, Inc.*, No. 22-CV-8916 (JSR), 2023 WL 7095975, at *10 (S.D.N.Y. Oct. 26, 2023) (quoting *Trustpilot Damages LLC v. Trustpilot, Inc.*, No. 21-CV-432 (JSR), 2021 WL 2667029, at *9 (S.D.N.Y. June 29, 2021)).

13

Additionally, "[a]n implied-covenant claim can survive a motion to dismiss only if it is based on allegations different than those underlying the accompanying breach of contract claim and the relief sought is not intrinsically tied to the damages allegedly resulting from the breach of contract." *Grant & Eisenhofer, P.A. v. Bernstein Liebhard LLP*, No. 14-CV-9839 (JMF), 2015 WL 1809001, at *4 (S.D.N.Y. Apr. 20, 2015) (internal quotation marks omitted); *see also Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 63 (S.D.N.Y. 2016).

In light of these standards, General Assembly's implied-covenant claim fails for two independent reasons. First, "[a] breach of implied covenant claim cannot be based on conduct permitted under the contract." *Golden Unicorn Enters., Inc. v. Audible, Inc.*, No. 21-CV-7059 (JMF), 2023 WL 4561718, at *9 (S.D.N.Y. July 17, 2023); *accord Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013). As discussed above, CIB LLC was on firm contractual ground rejecting the Purchase Notices at issue, notwithstanding its prior payment of other Purchase Notices. To apply the implied covenant, therefore, would improperly "negate" the parties' "expressly bargained-for" agreement. *S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 507 (S.D.N.Y. 2021). Second, and relatedly, General Assembly's implied-covenant claim is based on the same allegations as its breach-of-contract claim — namely, that CIB LLC reneged on its agreement to pay for two sets of Receivables — and seeks relief that is "intrinsically tied to the damages allegedly resulting from the breach of contract." *Grant & Eisenhofer*, 2015 WL 1809001, at *4; *see* Compl. ¶¶ 187-90; *see also, e.g.*, *Croft v. AXA Equitable Life Ins. Co.*, No. 17-CV-9355 (JMF), 2018 WL 4007646, at *3 (S.D.N.Y. Aug. 22, 2018) (dismissing the plaintiffs' implied covenant claim because it depended on the "exact same set of facts as their breach-of-contract claim"); *Alaska Elec. Pension Fund*,

175 F. Supp. 3d at 63 (same).  Accordingly, General Assembly's implied-covenant claim must be and is dismissed.

**C.  Promissory Estoppel**

General Assembly's final claim — against both Defendants for promissory estoppel — fails as a matter of law as well.  Promissory estoppel under New York law "requires a plaintiff to prove three elements: "(1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the promisee, and (3) unconscionable injury to the relying party as a result of the reliance."  *Aleem v. Experience Hendrix, L.L.C.*, 413 F. Supp. 3d 251, 259 (S.D.N.Y. 2019).  Additionally, where a plaintiff brings both contract and promissory estoppel claims, the plaintiff must "allege[] that the defendant had a duty independent from any arising out of the contract."  *WCA Holdings III, LLC v. Panasonic Avionics Corp.*, No. 20-CV-7472 (GHW), 2023 WL 8434776, at *19 (S.D.N.Y. Dec. 5, 2023).  When the plaintiff does not, "[c]ourts dismiss promissory estoppel claims as duplicative."  *Id.* (citing cases).

Here, General Assembly's claim against CIB III is duplicative of its contract claim.[3]  But the claim fails as to both Defendants for at least two other reasons as well.  First, General Assembly fails to allege a clear and unambiguous promise.  At most, the Amended Complaint alleges that Defendants encouraged General Assembly to continue its program remotely when the COVID-19 pandemic began and, through its course of dealing, led General Assembly to believe that CIB LLC would purchase the Receivables for the students enrolled in remote programs.  Compl. ¶¶ 80-105.  Given that encouragement, and CIB LLC's payment for some

---

[3] In arguing otherwise, General Assembly cites cases for the proposition that a plaintiff may allege promissory estoppel in the alternative when a defendant "dispute[s] the existence of a valid, enforceable contract."  Pl.'s Opp'n 23 (quoting *Hallett v. Stuart Dean Co.*, 481 F. Supp. 3d 294, 307 (S.D.N.Y. 2020).  But CIB LLC does not dispute the existence of a valid, enforceable contract; it merely argues — correctly — that it did not breach the contract.

15

Receivables that may not have been Eligible Receivables within the meaning of the FPA, it is understandable that General Assembly formed an expectation that CIB LLC would also purchase the Receivables at issue. But the Amended Complaint nowhere alleges a "clear and unambiguous promise" by Defendants to make those purchases. *See, e.g.*, *Cohen v. Lehman Bros. Bank, FSB*, 273 F. Supp. 2d 524, 529-30 (S.D.N.Y. 2003) (finding that broad supportive statements "cannot be construed as clear and unambiguous promises"). Second, and in any event, General Assembly does not allege that it suffered an "'unconscionable' injury, i.e., injury beyond that which flows naturally . . . from the non-performance of the unenforceable agreement." *Aleem*, 413 F. Supp. 3d at 261. Thus, General Assembly's promissory estoppel claims against both Defendants must be and are also dismissed.

## CONCLUSION

The Court understands why General Assembly would feel aggrieved by Defendants' conduct. The allegations in the Amended Complaint certainly suggest that Defendants, through word and conduct, led General Assembly to believe that it would get paid for the Receivables listed in Purchase Notices 005 and 006. But given its deviations from the requirements of the FPA, and its failure to insist upon a written amendment to the FPA, General Assembly had no entitlement to such payment. Accordingly, and for the foregoing reasons, Defendants' motion to dismiss is GRANTED, and General Assembly's claims are dismissed.

Additionally, the Court declines to *sua sponte* grant General Assembly leave to amend. To be sure, leave to amend a pleading should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). But it is "within the sound discretion of the district court to grant or deny leave to amend," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007), and there are several reasons to exercise that discretion to deny leave here. First, the problems with

General Assembly's claims are substantive, so amendment would be futile. *See, e.g.*, *Roundtree v. City of New York*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (citing cases). Second, General Assembly does not request leave to amend or suggest that it is in possession of facts that would cure the problems with its claims. *See, e.g.*, *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014) ("A plaintiff need not be given leave to amend if [it] fails to specify how amendment would cure the pleading deficiencies in [its] complaint."); *accord TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505-06 (2d Cir. 2014). Finally, the Court granted General Assembly leave to amend its original complaint in response to Defendants' first motion to dismiss, which raised the defects in the claims discussed above, and explicitly warned that General Assembly would "not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss." ECF No. 20. General Assembly's "failure to fix deficiencies in its previous pleadings is alone sufficient ground to deny leave to amend *sua sponte*." *Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 415 (S.D.N.Y. 2013) (citing cases).

The Clerk of Court is directed to terminate ECF No. 24, to enter judgment in Defendants' favor, and to close this case.

SO ORDERED.

Dated: March 8, 2024
New York, New York

JESSE M. FURMAN
United States District Judge